```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOSH WEBBER, and                            :
MUDDY WATER PICTURES LLC d/b/a              :
MUDDY WATER PICTURES, INC.,                 :
                                            :
                                            :
                      Plaintiffs,           :
                                            :
              - against -                    :
                                            :
DAMON ANTHONY DASH, and                     :
POPPINGTON LLC d/b/a                        :
DAMON DASH STUDIOS,                         :
                                            :
                      Defendants.           :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___8/30/2021___

19-cv-610 (RWL)

**DECISION AND ORDER:
SUMMARY JUDGMENT**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

This case is a dispute over copyright authorship and ownership in a film called "The List," later known as "Dear Frank" (the "Film"). Before the Court is the motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Plaintiff Muddy Water Pictures LLC ("Muddy"). Muddy asserts summary judgment should be granted in his favor, finding that Muddy is the sole owner and author of the Film. The motion is Muddy's third motion for summary judgment, the prior two motions having been denied. Unlike those two other motions, however, this motion follows completion of fact discovery. For the following reasons, Muddy's motion is GRANTED in part and DENIED in part.

## Factual Background

The facts are based on the parties' filings in support of and against summary judgment as well as admissible evidence elsewhere in the record. Pursuant to standards for summary judgment set forth below, the Court resolves all ambiguities and draws all reasonable inferences in favor of Defendants as the nonmoving parties.

## A.     The Parties And Their Intentions

As its name suggests, Muddy is a film production company.  Plaintiff Josh Webber is a movie director, whom Muddy hired to direct the Film.[1]  Defendant Damon Anthony Dash is, among other things, a producer and director.[2]

Muddy and Dash intended to work together on the Film; they dispute, however, what they each intended.[3]  According to Muddy, he initially intended to work with Dash and give him credit for direction in return for "the use of his celebrity associated with the film."[4]  Ultimately, however, Muddy and Dash could not reach an agreement on terms.[5]  Muddy hired Webber to direct the Film along with another individual named Brian White.[6]

---

[1] Defendants' Response To Plaintiffs' Rule 56.1 Statement Of Purported Undisputed Facts (Dkt. 213) ("56.1 Response") ¶¶ 2-3.

[2] Declaration Of Damon Dash In Opposition filed Feb. 11, 2019 (Dkt. 26) ("Dash Decl. I") at ¶ 8.  Dash has provided at least three different declarations in this case.  Dash Decl. I was submitted in opposition to Muddy's motion for a preliminary injunction.  The same declaration appears again at Dkt. 38.  Other Dash declarations include the Declaration Of Damon Dash in response to Plaintiffs' second motion for summary judgment relating to libel per se filed Feb. 18, 2020 (Dkt. 136) ("Dash Decl. II"); and the Declaration Of Damon Dash in opposition to Plaintiffs' second motion for summary judgment on the issue of ownership/authorship filed March 4, 2020 (Dkt. 148) ("Dash Decl. III").  In opposing the instant motion for summary judgment, Dash re-submitted Dash Decl. III (Dkt. 212).  There is no Dash declaration in opposition to Muddy's first motion for summary judgment.

[3] 56.1 Response ¶ 4.

[4] Affidavit Of Abdullah Muntaser filed February 12, 2019 (Dkt. 35) ("Muntaser Aff.") at ¶ 4.

[5] Muntaser Aff. at ¶ 4.

[6] Affidavit Of Josh Webber, filed Feb. 19, 2019 (Dkt. 36) at ¶ 3; Muntaser Aff. at ¶ 3; *see* 56.1 Response at ¶ 3 (admitting that Muddy hired Webber to direct the Film).

Dash tells a different story, although that story has shifted repeatedly. At the outset of this case, in opposing Muddy's motion for a preliminary injunction in February 2019, Dash averred that he "was hired" by Muddy to direct and produce the Film "in return for a 25% net interest in the Film's royalties (which I was to co-own, in perpetuity)."[7] Dash conceded that there was no written agreement, contending instead that he and Muddy had a verbal agreement.[8] Shortly after the Court granted Muddy's motion, Dash again asserted, by way of counterclaim, the same verbal agreement by which the he "was hired" by Muddy.[9] This time, however, Dash omitted the phrase "in perpetuity."[10]

About a year later in both February (in response to Muddy's second motion for summary judgment as to defamation) and March 2020 (in response to Muddy's second motion for summary judgment as to authorship and ownership), Dash submitted declarations describing an oral agreement with Muddy much different from the one he first described in February 2019. Instead of saying he "was hired" by Muddy, Dash asserted that "it was agreed by [Muddy] that I would direct and produce the film" in return for the same 25% net interest in the film's royalties and co-ownership.[11] According to Dash, his agreement with Muddy "was conditioned on there being a $250,000 budget

---

[7] Dash Decl. I at ¶ 20.

[8] Dash Decl. I at ¶¶ 20, 22.

[9] Answer and Counterclaim (Dkt. 48) at ¶ 16.

[10] A likely explanation for Dash's omission of the phrase "in perpetuity" is that just two days earlier, the Court granted Muddy's motion for a preliminary injunction based, in part, on having held that the oral agreement for royalties in perpetuity asserted by Dash was unenforceable under the statute of frauds. (Dkt. 46 at 12.)

[11] Dash Decl. II at ¶ 3; Dash Decl. III at ¶ 4.

which I was promised," even though his earlier declaration and counterclaim did not mention any such condition.   Dash also newly asserted that the "original verbal agreement/promise" was made by someone named Tony White, one of Muddy's employees.[12]   Dash avowed that White offered him White's own 25% interest in the Film and that Muddy's principal, Mike Muntaser, "acquiesced and ratified this verbal agreement," thus giving Dash a total of 50% interest in the Film.[13]   Even further, according to Dash, Muntaser promised Dash "total creative control."[14]

In deposition testimony, however, Dash denied the existence of a written or oral agreement with Muddy.   In the first installment of his deposition taken on November 21, 2019, Dash conceded:   "The nature of my relationship with Muddy was never ever, ever articulated."[15]   And in January 2021, Dash testified that he did not recall any agreement with Muddy "at all."[16]   Dash also admitted that he did not even meet Muntaser "until after the whole movie was shot."[17]

---

[12] Dash Decl. II at ¶¶ 3-4; Dash Decl. III at ¶ 18.  It is not clear to the Court whether Tony White is a different person from Brian White, but whether he is or is not is not material to determination of this motion.

[13] Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 20.

[14] Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 21.

[15] Transcript Of Deposition Of Damon Dash, Nov. 21, 2019 ("Dash Depo. I"), at p. 40, attached as Ex. A to Affidavit Of Christopher Brown In Support Of Plaintiffs' Motion For Summary Judgment (Ownership) filed June 7, 2021 (Dkt. 214) ("7/7/2021 Brown Aff.").

[16] Transcript Of Deposition Of Damon Dash, Jan. 29, 2021 ("Dash Depo. II"), at p. 15, attached as Ex. C to 7/7/2021 Brown Aff.

[17] Dash Depo. I at 39-40; *see also* Transcript Of Deposition Of Damon Dash, March 15, 2021 ("Dash Depo. III") at p. 46, attached as Ex. D to 7/7/2021 Brown Aff. ("Again, my acknowledgement of Muddy is after the film was shot, not before").

In opposing the instant motion for summary judgment, Dash once again says that a verbal agreement was made between Muddy and Dash. In support of that contention, however, he relies on the same February 2020 declaration submitted to the Court before his 2021 re-admission noting that there was no agreement.[18]

## B.    Production Of The Film

Shooting for the Film began in or about November 2016.   The parties sharply dispute each other's contributions the Film.   Dash contends that he directed the Film and rewrote portions of the Film's script.[19]   According to Plaintiffs, however, Dash did not provide any material services; to the contrary, he was routinely high, belligerent, and aggressive towards the crew and cast or was passed-out during principal photography. Dash denies those assertions.[20]   The parties both contributed resources to the Film.   For instance, Muddy paid in excess of $200,000 to produce and complete the film.[21]   Dash provided the house he was renting for the primary shoot location, furnished some wardrobe, and supplemented the camera machinery paid for by Muddy with one of his own cameras.[22]   The contracts with cast and crew are signed and executed with Muddy

---

[18] 56.1 Response at ¶¶ 4, 18-20.

[19] 56.1 Response ¶ 16; Dash Decl. III at ¶¶ 4, 8-9.

[20] 56.1 Response at ¶¶ 8-10, 15-16.

[21] 56.1 Response at ¶ 11.   Dash denies this assertion but the only evidence he cites to support that denial is the inapt averment that he provided certain equipment and wardrobe for shooting of the Film.

[22] 56.1 Response at ¶¶ 5-7, 11-12.

or for the benefit of Muddy,[23] but as set forth above Muddy and Dash dispute the nature of their business relationship with each other.

## C.    Post-Production Events And Communications

In 2017, Muddy registered the copyright for the Film with the United States Copyright Office, identifying only Muddy as the author of the Film.[24]

Early literature for the Film suggests that the parties had anticipated that Dash was going to be the primary or only director.  For instance, on March 21, 2017, Muntaser sent an email to Dash listing end credits for the Film, which named Dash as director and a co-producer, while listing Muntaser as the executive producer.  That same email lists Muddy next to the phrase "All rights reserved."[25]  A poster for the Film, sent from Muntaser to Dash in May 2018, similarly lists Dash as sole director, Muntaser as executive producer, includes logos for both "Mudd Films" and "Dame Dash Studios," and prefaces the title with "Damon Dash Presents."[26]

On January 18, 2019, well over a year after shooting of the Film was complete, Dash sent a text to Webber suggesting that Dash did not believe he owned the Film at all until after it had been made and he realized its value.  The exchange reads:

---

[23] 56.1 Response at ¶ 11.  Again, Dash denies this assertion but does not cite any evidence that contradicts it.

[24] 56.1 Response at ¶ 12; Copyright Registration attached as Ex. B to the operative complaint.

[25] Dash Decl. III, Ex. 1.

[26] Dash Decl. III, Ex. 2.

Webber:      Why do you think you "own" the movie

Dash:        I didn't feel that way until you guys did this…
             Now I know what I can get for it.
             Way more than 100 grand.[27]

### Procedural Background

## A.    The Parties' Claims

Muddy and Webber commenced this action on January 22, 2019.  The complaint asserted claims for copyright infringement under the federal Copyright Act as well as slander and libel under the laws of New York and Mississippi.  Muddy requested injunctive relief, statutory damages, attorney's fees, and a declaration that Muddy is the sole owner of the Film's copyright.   The currently operative complaint is the second amended complaint, which asserts the same causes of action as the initial complaint.[28]

Dash has asserted a counterclaim for declaratory relief that is merely the inverse of Muddy's claim.  Dash thus seeks a declaration that Dash is co-author of the Film and an owner of the Film.[29]

## B.    The Preliminary Injunction

On February 1, 2019, Muddy moved by order to show cause for temporary and preliminary injunctive relief to prevent Dash from marketing, advertising, or promoting the Film during pendency of the action.[30]   The Court granted the motion on February 25,

---

[27] Reply Affidavit Of Josh Webber, filed Feb. 12, 2019 (Dkt. 43) at Ex. A.

[28] *See* Dkt. 144.

[29] Dkt. 48 at 9.

[30] Dkt. 11.

2019.[31]   The Honorable Judge Colleen McMahon, U.S.D.J., to whom the case was assigned at the time, found that Plaintiffs were likely to succeed on the merits because, even though Dash contributed to the Film, he was "not likely to establish that he is a co-author or dominant author" of the Film and therefore had no authority to distribute or circulate the Film without Muddy's consent.[32]

Two of the Court's findings from its preliminary injunction decision are particularly relevant to the instant motion.  First, Judge McMahon noted that although "there are quite a few disputed facts" in this "he said / he said" case, "an admission by Dash disposes definitively of the key issue of fact and wins the day for Plaintiffs."[33]  Specifically, the Court found "[m]ost compelling on the issue of mutual intent … Dash's text message exchange with Webber, in which he concedes that he is holding up distribution of the Film because he now realizes its potential value."[34] Dash's message "strongly suggests that he never truly entertained in his mind the concept of joint authorship."[35]

Second, Judge McMahon found that Dash's "sole contention on the issue of authorship" was that he had a verbal agreement providing him with a 25% net interest in the Film's royalties, "which he was to co-own, in perpetuity," in exchange for his services as a director.[36]  That contention, however, did "not help his cause, either factually or

---

[31] Dkt. 46.

[32] Dkt. 46 at 13.

[33] Dkt. 46 at 7-8.

[34] Dkt. 46 at 11.

[35] Dkt. 46 at 11 (cleaned up).

[36] Dkt. 46 at 12.

legally" because, among other reasons, the purported verbal agreement was unenforceable under New York's statute of fraud, N.Y. Gen. Oblig. Law 5-701(a)(1), which renders unenforceable oral contracts for payment of royalties in perpetuity.[37]  "Removing the parties' purported 'verbal agreement' from the equation" left Dash "with no leg to stand on."[38]

## C.     The First Motion For Summary Judgment

After limited discovery, Plaintiffs moved for summary judgment in March 2019, arguing that Dash had defamed them under state slander and libel laws,[39] and Muddy filed a separate motion for summary judgment that Muddy is the sole author and owner of the Film.[40]  On March 21, 2019, Judge McMahon denied the motions in a brief one-page decision.[41]  The Court denied the motions "because, as should be clear from the Court's opinion granting Plaintiff's motion for a preliminary injunction, there are disputed issues of material fact in this case that will require trial."[42]  The Court did not provide any additional analysis.

## D.     The Second Motion For Summary Judgment

After several more months of discovery, Plaintiffs filed for summary judgment a second time in January 2020, again with separate motions filed for the authorship and

---

[37] Dkt. 46 at 12 (citing a "legion" of authority).

[38] Dkt. 46 at 13.

[39] Dkt. 57.

[40] Dkt. 63.

[41] Dkt. 69.

[42] Dkt. 69.

ownership issue,[43] and another for the defamation claims.[44]  In February 2020, the case was reassigned to the Honorable Lewis J. Liman, U.S.D.J.  On April 27, 2021, Judge Liman issued a decision denying Plaintiffs' second bid for summary judgment.[45]  The Court did so in a short opinion based on the law-of-the-case doctrine and Judge McMahon's earlier findings.[46]

## E.   The Instant Motion For Summary Judgment

Discovery continued and ended March 30, 2021.[47]  With discovery completed on April 20, 2021, Muddy filed its third motion for summary judgment on authorship and ownership of the Film.[48]  The parties fully briefed the motion as of June 7, 2021.  On July 2, 2021, the case was reassigned to me for all purposes pursuant to the parties' consent.[49]

Muddy argues that it is entitled to summary judgment because it is indisputably the sole owner of the Film's copyright, and because there is insufficient evidence to prove

---

[43] Dkt. 115.

[44] Dkt. 122.

[45] Dkt. 157.

[46] Dkt. 157 at 3-4.

[47] Completing discovery proved to be quite an ordeal, at least for Muddy, almost entirely due to the obstreperous, defiant, and outrageous conduct of Dash.  For instance, Dash repeatedly interfered with Muddy's attempts to depose him, and, when finally put under oath, responded to Plaintiff counsel's questions with personal insults and slurs.  (*See* Dash Dep I, Dkt.102.)  The Court also has been compelled to both sanction Dash on multiple occasions for such interference and admonish Dash for his behavior in Court. (*See* Dkts. 88, 98, 103.)

[48] Dkt. 203.

[49] Dkt. 216.

that the parties fully intended to be joint authors or that Dash is the dominant author of the Film.  In support of those arguments, Muddy relies principally on statements by Muntaser and Webber and admissions by Dash.  Muddy further argues that summary judgment is warranted with respect to the oral agreement alleged by Dash because there is no evidence of such an agreement, and even if there was an oral agreement, it would be unenforceable under the statute of frauds.

In opposition, Dash argues that the motion should be denied under the law-of-the-case doctrine in light of Judge McMahon's and Judge Liman's denials of the earlier motions for summary judgment.  Dash also highlights communications from Muddy to Dash, as well as Dash's contributions to the Film, as proof that the parties intended to be joint authors and owners and that Dash is in fact the dominant author.

In reply, Muddy contends that the evidence relied upon by Dash contradicts earlier declarations and deposition testimony and therefore cannot be used to defeat summary judgment.  As for law of the case, Muddy notes that further discovery has been taken, indeed has been concluded, since the earlier motions for summary judgment, and that Dash's more recent sworn statements and deposition testimony warrant summary judgment at this juncture.

**Summary Judgment Standards**

To obtain summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a).  A fact is material "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  The moving party bears the initial burden of identifying

"the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).  The opposing party must then come forward with specific materials establishing the existence of a genuine dispute. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008).  Where the nonmoving party fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

The moving party may demonstrate the absence of a genuine issue of material fact "'in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).  A party asserting that a fact cannot be, or is genuinely, disputed "must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Powell v. National Board of Medical Examiners*, 364 F.3d 79, 84 (2d Cir. 2004) (if movant demonstrates absence of genuine issue of material fact, nonmovant bears burden of demonstrating "specific facts showing that there is a genuine issue for trial").

In assessing the record to determine whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all reasonable inferences in favor of

the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016); *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) ("The district court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party."). The court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment may be granted, however, where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Id.* at 249-50, 106 S.Ct. at 2511. If there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).

Under the local rules of this District, the moving party has the obligation to submit a statement of undisputed material issues of fact warranting summary judgment, and the opposing party must submit a corresponding statement responding to each item set forth in the movant's statement. Local Rule 56.1(a), (b). The parties did so here. Additionally, a non-moving party may submit a statement of additional material issues of fact that the party contends are disputed and require trial. Local Rule 56.1(b). Defendants did not submit any such statement. Accordingly, the Court need only consider whether Plaintiffs' statements of undisputed fact, and the evidence cited in support, establish the claims they assert, and whether the evidence cited by Defendants in opposition creates a genuine dispute as to any of those facts. That said, the Court has reviewed and considered the entire summary judgment record.

## Discussion

The Court addresses the issues as follows.  First, the Court examines whether there is evidence of an enforceable contract giving Dash ownership in the Film sufficient to survive summary judgment.  The Court finds there is not.  Second, the Court considers whether factual disputes preclude summary judgment on the copyright authorship issue.  The Court finds that there are indeed disputed issues of material facts precluding summary judgment.

## A.    Summary Judgment On Oral Contract

As Judge McMahon observed in granting Muddy's motion for a preliminary injunction, the question of whether the contract alleged by Dash – providing him with co-authorship and/or ownership of the Film – is pivotal.  Without there being an enforceable contract, Dash has "no leg to stand on."[50]

The parties agree there is no written contract.  As to whether there was an oral agreement, Dash has made contradictory statements.  In his declarations opposing the motion for a preliminary injunction and earlier motions for summary judgment, as well as in his counterclaim, Dash asserted that he had a verbal agreement with Muddy.  Each averment, however, described the terms of the purported agreement differently than the others.[51]  And, at deposition Dash conceded in November 2019 that "[t]he nature of my

---

[50] Dkt. 46 at 13.

[51] Compare Dash Decl. I at ¶ 20 (Muddy "hired" Dash in return for 25% net interest "in the Film's royalties (which I was to co-own, in perpetuity); Dash Answer with Counterclaim at ¶ 16 (removing the word "perpetuity"); Dash Decl. III at ¶ 18 (no longer using the term "hired" and adding condition for $250,000 budget as communicated by Muddy employee); and Dash Decl. III at ¶ 20 (increasing interest from 25% to 50% based on statement by Muddy employee and acquiescence by Muntaser).

relationship with Muddy was never ever, ever articulated," and, in January 2021 that he did not recall any agreement with Muddy "at all."[52]  Now, in opposing the instant motion, Dash reasserts the existence of an oral agreement based on the same March 2020 declaration that contradicted his November 2019 deposition testimony and preceded his contradictory January 2021 deposition testimony admission.  In doing so, Dash violates the "sham affidavit" rule.

"It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted).  "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Hayes v. N.Y.C. Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Hayes*, 84 F.3d at 619 (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). Accordingly, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Id.*

---

[52] Dash Depo I at p.39; Dash Depo II at p.14.

The sham affidavit rule applies squarely to what Dash seeks to do here.  He cannot rely on a February 2020 declaration to contradict his earlier November 2019 deposition testimony.  Moreover, his most recent deposition testimony that he had no agreement with Muddy "at all" undermines his attempt to resurrect the February 2020 declaration asserting an oral agreement with Muddy.  There thus is no genuine issue for trial as to the existence of an oral agreement.

But even if there were an oral agreement as alleged by Dash, summary judgment still would be warranted because the alleged agreement for payment of royalties "in perpetuity" would be unenforceable under the statute of frauds as Judge McMahon previously held.[53]  *See* N.Y. Gen. Oblig. Law 5-701(a)(1) (agreement must be in writing if "by its terms is not to be performed within one year from the making thereof").[54]  Indeed, Dash concedes that the purported oral agreement is not enforceable.[55]

Accordingly, Muddy is entitled to summary judgment that there was no enforceable agreement providing Dash with ownership or authorship rights in the Film. Notwithstanding that determination, and as discussed next, disputed issues of material fact remain as to whether Dash is a joint or dominant author of the Film.

---

[53] Dkt. 46 at 12.

[54] Dash removed the words "in perpetuity" from the purported terms of the oral agreement in his counterclaim and declarations, all of which came after he already had described the agreement as being in perpetuity in his declaration opposing Muddy's motion for preliminary injunction.  That attempt to skirt his own admission, however, is just another instance of Dash's transgressing the sham affidavit rule.

[55] Defendants' Memorandum Of Law In Opposition To Plaintiffs' Third Motion For Summary Judgment On The Issue Ownership/Authorship Of The Film filed on May 25, 2021 (Dkt. 211) ("Opp. Mem.") at 6 (addressing the parties' intentions "despite the unenforceability of the parties' verbal agreement").

**B.      No Summary Judgment On Authorship And Ownership**

Even without an enforceable contract, Dash could still have authorship and ownership rights in the Film.  That determination rests on the parties' intent and their contributions to the Film.  Because the parties have presented conflicting evidence on both those material issues, summary judgment may not be granted.

**1.  Authorship And Ownership Under The Copyright Act**

The Court recapitulates here Judge McMahon's description of the relevant legal framework for copyright authorship and ownership in the absence of an agreement.  The Copyright Act vests initial ownership of the copyright in a work in the "author or authors of the work." 17 U.S.C. § 201(a). This provision recognizes that a work may contain multiple authors. The test for co-authorship is embodied in the Act's definition of a "joint work."  *See Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991) (internal citation omitted). Thus, at issue is whether the Film qualifies as a joint work.

A joint work is defined as one that is "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Where, as here, no contract addresses co-authorship, the Second Circuit has established a two-pronged test for determining when a contributor to a copyrighted work is to be considered a joint author.  A co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors.  *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (citing *Childress*, 945 F.2d at 507–08).

The Second Circuit has clarified that the first prong – specifically, the phrase "independently copyrightable" – is not to be read literally.  *See 16 Casa Duse, LLC v.*

*Merkin*, 791 F.3d 257, 255 n.3 (2d Cir. 2015) (quoting 2 Patry on Copyright § 5:15). Rather, the pertinent inquiry is whether the purported co-author created and contributed at least some amount of original expression. *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 1287 (1991). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* at 345, 111 S.Ct. at 1287.

For the second prong, "a specific finding of mutual intent [is] necessary." *Thomson*, 147 F.3d at 202. Indeed, mutual intent is the sine qua non of the co-authorship inquiry. *See id.* at 199; see also H.R Rep. No. 1476, 94th Cong, 2d Sess. 120 (1976); S. Rep. No. 473, 94th Cong, 1st Sess. 103 (1975). Although co-authors need not understand the legal consequences of co-authorship, "some distinguishing characteristic of the relationship must be understood in order for it to be the subject of their intent." *Childress*, 945 F.2d at 508. "Factual indicia of ownership and authorship" to be considered include whether the parties intended to be credited or "billed" as co-authors, the parties' views of decision-making and creative control, and the right to enter into third party contracts. *Thomson*, 147 F.3d at 202–04. While "[i]ntent 'at the time the [work] is done' remains the 'touchstone,' ... subsequent conduct is normally probative of a prior state of mind." *Childress*, 945 F.2d at 509.

Where two or more parties each contribute the requisite degree of expression to a work but do not mutually intend to be co-authors (and thus do not qualify as such), the "dominant" author of the work is deemed the work's sole author. *16 Casa Duse*, 791 F.3d at 260. The dominant author inquiry entails consideration of the same "'factual indicia of ownership and authorship' that are relevant to the joint-author inquiry." *Id*.

In all cases, "[c]are must be taken to ensure that true collaborators in the creative process are accorded the perquisites of co-authorship and to guard against the risk that a sole author is denied exclusive authorship status simply because another person rendered some form of assistance." *Childress*, 945 F.2d at 504.  This is especially so in cases where "one person [ ] is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another [ ] are joint authors." *Id.* at 508.

### 2.  Disputed Issues Of Material Fact Exist

As is evident from the factual background set forth above, the parties dispute each other's intentions with respect to authorship and their contributions to the Film.  For instance, with respect to intent, assorted facts support Muddy's authorship and ownership.  Some examples include Muddy's having entered into the contracts with cast and crew and admission by Dash that he was "hired" by Muddy.  There also is the evidence that Judge McMahon found "[m]ost compelling on the issue of mutual intent … Dash's text message exchange with Webber, in which he concedes that he is holding up distribution of the Film because he now realizes its potential value."[56] Dash, however, argues that even if the parties had no agreement as to authorship and ownership, the representations and promises the parties are alleged to have made evince an intention that Dash be a co-owner.  Dash also highlights, among other things, the email and Film marketing material he received from Muntaser in which Dash is billed as director and Dash's production company logo appears along with Muddy's.  Although Dash's evidence

---

[56] Dkt. 46 at 11.

may be thin, and belied by his own words and contradictions, it is enough to create a genuine dispute regarding whether the parties fully intended to be co-authors.

Similarly, there is conflicting evidence with respect to the parties' contributions to the Film.  Muddy has put forward evidence that he was the executive producer of the Film, hired Webber who directed the Film with Brian White, and paid to produce the film, while Dash did not materially contribute and was high on set and disruptive.  Dash has submitted evidence that he provided his house for the main set and shooting location, contributed camera equipment for filming, and to some extent provided input on the script and editing of the Film.  He also has provided evidence in the form of video footage, described by Dash as showing him coaching the actors and directing Josh Webber and other cast and crew.[57]  There thus is a genuine dispute as to whether Dash created and contributed at least some amount of original expression to the Film.  For the same reason, there also is a genuine dispute as to whether, in the event the parties did not intend to be co-authors, Dash is the dominant author.

In *16 Casa Duse*, the Second Circuit affirmed the district court's determination on summary judgment that a production company, and not the director, was the dominant author and thus the sole owner of the copyrighted film at issue.  791 F.3d at 260.  Unlike here, the parties each disclaimed joint authorship.  *Id.* at 256 n.4.  That said, the evidence of authorship there has some similarity to the evidence here, particularly in that the production company in *16 Casa Duse* entered into all third-party agreements for making the film, and all those agreements were on a work-for-hire basis.  *Id.* at 261.  Muddy has submitted unrefuted evidence that he entered into work-for-hire agreements with the cast

---

[57] Dash Decl. III at ¶ 10 and Exs. C1-C4.

and crew of the Film (other than Dash), while Dash has not presented any evidence that he entered into any such agreements.  That is significant because under the Copyright Act, "the … person for whom the work[-for-hire] was prepared is considered the author." 17 U.S.C. § 201(b).

Second, the evidence of how the parties billed or credited themselves in *16 Case Duse* was "essentially neutral" because "both parties initially intended to take some credit for the final product."  *Id.* at 260-61.  The same can be said here.  Moreover, none of the materials cited by Dash expressly refer to anyone as the "author" of the Film; rather, they merely show that both Dash and Muddy had roles in making the Film.

Third, although the director in *16 Casa Duse* "made a variety of creative decisions related to camera work, lighting, blocking, and actors' wardrobe, makeup, and dialogue delivery," the production company "exercised far more decision-making authority," having initiated the project, acquired the rights to the screen play, selected the cast, crew and director, controlled the production schedule, and coordinated the film's publicity and release.  *Id.* at 260. That may well be the case here, although the record submitted on summary judgment does not provide enough detail in that regard.  Indeed, although discovery is complete, the evidence submitted on summary judgment is not all that more robust than when summary judgment was last denied.

In short, the record here is not so fully developed as in *16 Case Duse*, and the evidence that does exist presents genuine dispute as to the material issues of contribution and intent for determining authorship.[58]  *See, e.g.*, *Huurman v. Foster*, No. 07-CV-9326,

---

[58] Following briefing, Muddy brought to the Court's attention a recent decision in which the Second Circuit affirmed judgment against Dash on his claim for joint or dominant authorship in another movie.  *Brooks v. Dash*, 852 F. App'x 40 (2d Cir. 2021).  The district

2010 WL 2545865 (S.D.N.Y. June 21, 2010) (denying summary judgment on claim to joint authorship in film); *Gillespie v. AST Sportswear, Inc.*, No. 97-CV-1911, 2001 WL 180147 (S.D.N.Y. Feb. 22, 2001) (denying summary judgment on claim to joint authorship in designer photographs and advertising designs); *Kaplan v. Vincent*, 937 F. Supp. 307 (S.D.N.Y. 1996) (denying summary judgment on claim to joint authorship in unpublished manuscripts); *see also Marshall v. Marshall*, No. 08-CV-1420, 2012 WL 1079550 (E.D.N.Y. 2012) (rejecting claim to joint authorship in video series following denial of summary judgment and trial).   Summary judgment finding that Dash is not a joint or dominant author thus is not warranted.

## Conclusion

For the foregoing reasons, Plaintiff's motion is GRANTED in part and DENIED in part.   Summary judgment is denied with respect to Muddy's claim for ownership and authorship but is granted with respect to there being no enforceable contract between Muddy and Dash.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: August 30, 2021
          New York, New York

---

court's decision, however, was rendered after trial; the court previously had denied plaintiff's motion for summary judgment.   *See Brooks v. Dash*, 454 F.Supp.3d 331, 334 (S.D.N.Y. 2020).   Dash could well suffer the same fate here that he did in *Brooks*, but that cannot be determined until trial.