UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------X
```

JOSH WEBBER, and
MUDDY WATER PICTURES LLC d/b/a
MUDDY WATER PICTURES, INC.,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/14/2022

             Plaintiffs,

19-CV-610 (RWL)

**DECISION AND ORDER:
POST-TRIAL MOTION**

    - against -

DAMON ANTHONY DASH, and
POPPINGTON LLC d/b/a
DAMON DASH STUDIOS,

             Defendants.

```
--------------------------------------------------------X
```

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

At the end of four-day trial, the jury unanimously found the defendants liable for copyright infringement and defamation. The jury awarded $30,000 in damages to Plaintiff Muddy Water Pictures LLC ("Muddy") for infringement of Muddy's copyright in the film "The List," later known as "Dear Frank" (the "Film"); $400,000 in compensatory damages and $250,000 in punitive damages to Josh Webber ("Webber") for defamation; and $125,000 in punitive damages, but zero compensatory damages, to Muddy for defamation. Defendants Damon Anthony Dash ("Dash") and his production company Poppington LLC ("Poppington") have moved, pursuant to Fed. R. Civ. P. 59(a) and (e), for remittitur of punitive damages, or, alternatively, a new trial on punitive damages. For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

1

**Background[1]**

Muddy and Webber initiated this action on January 22, 2019.   A jury trial commenced on March 24, 2022 and concluded on March 29, 2022.  The jury returned its verdict on March 30, 2022.  The Defendants' motion focuses on the jury instructions and verdict form with respect to Plaintiffs' defamation claims.   Accordingly, the following background does so as well.

**A.    Plaintiffs' Defamation Claims**

Muddy financed and produced the Film.  Webber directed it.  Muddy retained Dash and his production company for their celebrity cache.   The initial dispute between the parties centered on the extent of Dash's contribution to the Film and who owned the copyright in the Film.  As the evidence clearly showed, and as the jury found, Muddy is the sole owner of the Film copyright.  Indeed, from the outset of the case, Dash was preliminarily enjoined from marketing and promoting the Film.[2]

During trial, the Plaintiffs put on overwhelming evidence that the Defendants maliciously defamed both Webber and Muddy.  Plaintiffs' defamation claims arose from social media posts Defendants issued in response to the parties' dispute about who directed the Film and who owned the Film.  For instance, in one post, Dash referred to Webber as a "culturevulture" falsely claiming credit for direction of the Film, and to Muddy

---

[1] As the jury awarded punitive damages solely in connection with Plaintiffs' defamation claims, the Court does not address the copyright aspect of the case other than to the extent it provides context.

[2] *See* Decision And Order Granting Plaintiffs' Motion For A Preliminary Injunction, February 25, 2019 (Dkt. 46.)

as paying Webber to take credit for Dash's work.  (PX 1; Tr. 49-51.[3])  In another post, on which Dash tagged Variety, TMX, and other media outlets, Dash stated that Muddy "is pretending he owns" the Film (PX 13; Tr. 237-39), and Webber "(pure culture vulture) is pretending he directed" the Film (PX 9).  The most egregious post, however, came just over two weeks after Plaintiffs filed the initial complaint in this case.  (*See* Tr. 179.)

On February 5, 2019, a post appeared on both Dash's personal Instagram page and Poppington's Instagram page (the "2/5/2019 Post").  (PX 5; Tr. 240-41.)  The post led with an image and embedded video of a child claiming that the child had not been paid for having acted in The Jump Out Boys, a film having no connection with either Webber or Muddy.  (Tr. 54, 241.)  Despite the absence of any such connection, and despite the fact that the video made no reference to either Webber or Muddy, the post authored by Dash read, in relevant part, as follows:

> Now this is Disgusting … apparently @joshawebber […] and their crooked lawyer […] and I suspect @muddfilms robbed a 7 year old on another movie[.] this is crazy and it has to stop[.] there will be a class action suit…who ever got robbed by these clowns holla…lawsuit on me"

(PX 5.)  Dash never even reached out to Webber or Muddy to ask if they had anything to do with The Jump Out Boys or the child.  (Tr. 64-65, 481.)

Dash's Instagram page has over one million followers, and when a screenshot of the page was taken, the specific post had already garnered over 26,000 views.  (Tr. 54-55.)  The response to Dash's postings was particularly painful for Webber.  (Tr. 49-52.)  In the wake of the postings, Webber's phone "blew up" with comments, including even

---

[3] "PX" refers to plaintiffs' exhibits admitted at trial.  "Tr." refers to the transcript of the trial, which was held on March 24-25 and 28-30, 2022 (Dkts. 275, 277, 279, 281, 283, 301.)

death threats.  (Tr. 51-53.)  And even though Webber notified Dash that Webber was receiving death threats, Dash "continued to do this very thing online over several weeks." (Tr. 52-53.)

The Instagram postings also had financial consequences, especially for Webber. As a direct result of the postings, an investor pulled out of a deal to invest six million dollars in a movie to be made by Webber (PX 11; Tr. 58-59); Webber lost an offer to direct a movie that would have paid him $275,000 (PX 45; Tr. 62-64); and although Webber had been in discussions on several other projects, his calls were no longer returned  (Tr. 61-62).

**B.   The Charge Conferences**

The Court held multiple charge conferences with the parties to discuss both jury instructions and the verdict form.  On March 11, 2022, the Court reviewed draft jury instructions one-by-one with counsel.  Neither party objected to the instruction on punitive damages.  (3/11/2022 Teams Tr. 58-59.[4])

Prior to commencement of trial, the Court provided the parties with a copy of the final jury instructions.  On the morning of March 24, 2022, before providing initial instructions to the jurors, the Court solicited any objections that the parties had with respect to the instructions and the verdict sheet.  (Tr. 6-8.)  The parties each affirmed that they had no objections.  (*Id.*)  The parties also agreed that all instructions, including on the substantive law, should be read to the jury at the outset of trial and not just in the concluding charge.  (*Id.*)  The Court explained that should any of the instructions need to

---

[4] "3/11/2022 Teams Tr." refers to the uncertified transcript of proceedings as recorded by the Teams application for the Court's conference with the parties, which was held remotely.  (Dkt. 304.)

be amended based on developments during trial, the parties would have the opportunity

to address the issue.  (*Id.*)

On both March 28, 2022 (Tr. 529), the penultimate day of trial, and March 29, 2022

(Tr. 534), the day of final arguments and charge to the jury, the Court once again solicited

counsel for any further issues with the jury instructions or verdict form.  Defendants did

not raise any objection or issue with respect to either the instructions or verdict form.

## C.  The Jury Charge

The jury instructions and verdict form provided to the jury on March 29, 2022 were

the same as those approved by the parties.  As to punitive damages for defamation, the

jury was instructed as follows:

> "[I]f you find that either plaintiff has proven defamation, then
> you may also award punitive damages.  To be clear, that is
> you may also award punitive damages, but only if you find that
> Josh Webber or Muddy Water Picture has proven by a
> preponderance of the evidence that the defendant's
> defamatory conduct was malicious or reckless.  An act is
> malicious or reckless if it is done in such a manner an under
> such circumstances as to reflect utter disregard for the
> potential consequences of the act on the rights of others.  The
> purpose of punitive damages is to punish a defendant for
> shocking conduct and to set an example in order to deter the
> defendant and others from committing similar acts in the
> future.  To be clear, you may award punitive damages only in
> connection with plaintiff's defamation claim.  Punitive
> damages may not be awarded in connection with plaintiff's
> copyright infringement claim.  Further, an award of punitive
> damages is within your discretion; you are not required to
> award them even if you find one or both of the defendants
> liable for defamation."

(Tr. 607-08.)

As relevant here, the verdict form contained the following questions:

> 10.  Has Josh Webber proven by a preponderance of the
> evidence that he was defamed by Damon Dash?

11.    Has Josh Webber proven by a preponderance of the evidence that he was defamed by Poppington LLC?

12.    ANSWER THIS QUESTION ONLY IF YOU ANSWERED "YES" TO EITHER QUESTION 10 OR 11.   IF YOU ANSWERED "NO" TO BOTH QUESTIONS 10 AND 11, THEN GO TO QUESTION 13.

      a.    What amount of compensatory damages do you find that Josh Webber should recover for defamation?

      b.    What amount, if any, do you find that Josh Webber should receive as punitive damages?

(Dkt. 265 ("Verdict Form") at questions 10-12.)  The questions with respect to whether the Defendants defamed Muddy followed the same pattern and language.  (Verdict Form at questions 13-15.)

The jury was provided with a copy of the jury instructions along with the verdict form for their deliberations.  (Tr. 584.)

## D.    The Verdict

During their deliberations, the jury submitted a question concerning punitive damages:  "We assume there are no legal limits to punitive damages. Is this correct?" (Tr. 619.)  The Court acknowledged that there are limits on punitive damages but queried counsel whether that limitation required any further instruction to the jury.  (*Id.*)  In the absence of any suggestion or authority from counsel on that subject, the Court  proposed answering the jury in the affirmative but that the Court could consider at a later time (i.e., post-verdict) if adjustments needed to be made to a punitive damages award.  (*Id.* at 619-20.)   Neither counsel objected to answering the jury affirmatively.   (*Id.* at 620.) Accordingly, the Court proceeded to do so.  (*Id.* at  621.)

The jury rendered their verdict on the second day of deliberations and found that both Dash and Poppington had defamed Webber.  (Verdict Form at questions 10-11.) The jury awarded Webber $400,000 in compensatory damages and $250,000 in punitive damages.  (Verdict Form at questions 12a-b.)  The jury also found that both Dash and Poppington had defamed Muddy.  (Verdict Form at questions13-14.)  The jury awarded Muddy no compensatory damages but awarded Muddy punitive damages in the amount of $125,000.  (Verdict Form at questions. 15a-b.)  The Court entered an Amended Judgment on April 11,  2022.[5]  (Dkt. 274.)

### E.   The Instant Motion

Defendants timely filed the instant motion on May 9, 2022.[6]  The motion requests a new trial or remittitur solely on the issue of punitive damages.  (Dkt. 289.)  Defendants argue that the verdict form questions about the amount of punitive damages were erroneous as they did not include language informing the jury that they could award punitive damages only if they found by a preponderance of the evidence that Defendants had acted maliciously or recklessly.  (Dkt. 289-1 at 3, 6.)  Defendants also argue that the amount of punitive damages awarded was excessive.  (Dkt. 289-1 at 6.)

---

[5] The judgment was amended to address typographical errors.  (*See* Dkt. 272 (Plaintiffs' letter requesting corrections).)

[6] A Rule 59 motion to alter or amend a judgment must be filed within 28 days of entry of judgment.  Fed. R. Civ. P. 59(e).  Defendants filed their motion on the 28th day. Defendants previously had filed a notice of appeal on April 27, 2022.  When Defendants subsequently filed their Rule 59 motion, Defendants acknowledged that the appeal was "no longer effective."  (Dkt. 292 at 2).  The Second Circuit issued a stay of the appeal on May 11, 2022.  (Dkt. 296).

**Standards For Remittitur Or New Trial**

"A district court may grant a motion for new trial under Rule 59 if 'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice.'"  *Stampf v. Long Island Railroad* Company, 761 F.3d 192, 202 (2d Cir. 2014) (quoting *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir.2005) (alternation in original).  Whether a new trial is warranted under Rule 59(a) is a question that is "committed to the sound discretion of the district court."  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 143 (2d Cir. 1998).

"'Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.'"  *Stampf*, 761 F.3d at 204 (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984)).  "In considering motions for a new trial and/or remittitur, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered."  *Id.* (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435, 116 S. Ct. 2211, 2223 (1996) (quoting *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279, 109 S.Ct. 2909, 2922 (1989))).

A district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in two scenarios: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" and "(2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a

particular, quantifiable error." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993).  Where there is no particular discernable error, a jury's award may not be set aside as excessive unless "the award is so high as to shock the judicial conscience and constitute a denial of justice." *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988).  To determine whether an award is so high as to "shock the judicial conscience," the Court must consider the amounts awarded in other, comparable cases. *See Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997).  If the Court finds that remittitur is warranted, it "should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive." *Earl v. Bouchard Transportation Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990).

### Discussion

For the most part, Defendants have not established a basis for remittitur or new trial.  By not having objected to the verdict form before its being given to the jury, Defendants waived their right to object to it.  And, in any event, the verdict questions on punitive damages are not erroneous or inconsistent with the jury instructions.  Further, the punitive damages awarded by the jury to Webber are not excessive.  The punitive damages awarded to Muddy, however, cannot stand.

### A.   Defendants Waived Any Right To Object To The Verdict Form

As set forth in the background section above, Defendants never objected to the verdict form that the Court submitted to the jury.  Their failure to object any time before the jury began deliberations waived their right to object after trial.

Parties who wish to object to a Court's jury instruction or verdict sheet "must do so on the record, stating distinctly the matter objected to and the grounds for the objection."

Fed. R. Civ. P. 51(c)(1).  Moreover, "to avail itself of relief under this Rule, a party must object before the jury retires to deliberate."  *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002).  The Second Circuit has "emphasized that failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection." *Id.* at 57 (quoting *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir.1992)) (internal alterations and quotation marks omitted); *see also Smith v. Lightning Bolt Products*, 861 F.2d 363, 370 (2d Cir.1988) (objections to the "form or substance of such questions" are waived unless the party objects prior to the jury retiring) (citing *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 710 n. 8 (2d Cir.1983)).

Defendants had a full and fair opportunity to object to the verdict form.  The Court provided all parties with a copy of the form and reviewed it with the parties.  The Court expressly asked the parties whether they had any objections, and none were offered.  Nor did Defendants object any time between review of the verdict form with the Court and submission of the verdict form to the jury.  Having failed to object to the verdict form before the jury's deliberations, Defendants waived the objection they raise now concerning the verdict form's questions addressed to punitive damages.  *See, e.g., Henry v. Dinelle*, 557 F. App'x 20, 22 (2d Cir. 2014) ("To the extent that Henry also contends that the verdict was inconsistent, he waived that argument by failing to object to either the jury instructions or the verdict form, and by failing to object to the inconsistent verdict before the jury was excused"); *Spinelli v. City Of New York*, No. 02-CV-8967, 2011 WL 2802937, at *4 (S.D.N.Y. July 12, 2011) (finding waiver of right to object to verdict form as inconsistent

with jury instructions where the party "never objected to the use of the Special Verdict Form used by the jury").

## B.   The Verdict Form's Punitive Damages Questions Are Neither Inconsistent Nor Erroneous

In the absence of a party's timely objection to a verdict form, "a Court's review is limited to the determination of whether the jury instruction or verdict sheet contained a fundamental error."  *Spinelli*, 2022 WL 2802937 at *5 (citing J*arvis*, 283 F.3d at 62.)  An error is fundamental when it is "so serious and flagrant that it goes to the very integrity of the trial" and includes an error which "deprive[s] the jury of adequate legal guidance to reach a rational decision."  *Jarvis*, 283 F.3d at 62 (quoting *Shade v. Housing Authority of New Haven*, 251 F.3d 307, 313 (2d Cir.2001) and *Werbungs v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir.1991)).

The verdict form's questions on punitive damages contain no error, let  alone one that is fundamental.  Defendants argue that the questions are erroneous and inconsistent with the jury instructions because the questions "instructed to answer the questions on punitive damages regardless of whether Plaintiffs ever proved, by a preponderance of evidence, that Defendants [sic] conduct rose to the level of malice or recklessness" and permitted the jury to award punitive damages based solely on "a mere finding that Defendants defamed Plaintiff."  (Dkt. 289-1 at 6.)  Defendants contrast the questions concerning punitive damages for defamation with questions elsewhere in the verdict sheet concerning copyright infringement, for which the jury was asked to determine if

Plaintiffs had proven by a preponderance of the evidence that Defendants acted willfully. (Dkt. 289-1 at 5 (referencing questions 6 and 8 of the verdict form).)

Defendants' argument mischaracterizes the record.  The verdict form did not instruct the jury that they could award punitive damages without a finding that Defendants acted maliciously or recklessly.  Rather, the relevant questions – 12b and 15b – were neutral, asking what amount, if any, the jury finds that the Plaintiff should receive as punitive damages.  The jury, however, was expressly instructed – both at the outset of trial and at the end prior to deliberating – on the need to find malicious or reckless conduct and to do so by a preponderance of the evidence.  Jury instruction number 24 thus instructed: "To be clear, that is you may also award punitive damages, but only if you find that Josh Webber or Muddy Water Picture has proven by a preponderance of the evidence that the defendant's defamatory conduct was malicious or reckless.  An act is malicious or reckless if it is done in such a manner an under such circumstances as to reflect utter disregard for the potential consequences of the act on the rights of others." (Tr. 607-08.)  There is a "strong presumption that the jury in reaching its verdict complied with [the court's] instructions."  *Woods v. Oneida County*, 575 F. App'x 11, 13 (2d Cir. 2014) (quoting *Bingham v. Zolt*, 66 F.3d 553, 563 (2d Cir.1995)).

Considering the verdict form in the context of the instructions twice given to the jury, as the Court must, the verdict form questions on punitive damages were neither inconsistent with nor contradictory to the instructions given.  *See Woods*, 575 F. App'x at 12-13 ("In assessing the appropriateness of special verdict questions, we must read challenged questions in conjunction with the judge's charge to the jury. …Viewed in the full context of the jury instructions, the omission from the special verdict sheet" of the

phrase "reasonable accommodation" was neither fundamental nor plain error) (internal quotation marks omitted); *Spinelli*, 2011 WL 2802937 at *6 ("The Special Verdict Form and the jury charge were not inconsistent. … While the Special Verdict Form did not repeat verbatim the elements Spinelli needed to prove to recover emotional distress damages, the form was not inconsistent with the jury charge since it asked what damages (collectively the emotional distress and any loss of reputation damages) Spinelli had suffered. What comprised those damages had already been explained in the jury charge and made clear during the trial.").   Defendants have failed to identify any error, fundamental or otherwise, warranting either remittitur or a new trial.

**C.     The Amount Of Punitive Damages Awarded**

Whether the amount of punitive damages awarded is excessive warrants separate analyses for Webber and Muddy.   The punitive damages awarded to Webber are not excessive.   The punitive damages awarded to Muddy, however, are excessive and subject to remittitur.

**1.   Standards For Determining Whether Punitive Damages Are Excessive**

"Regarding the magnitude of punitive damage awards, due process requires that they be reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."   *Bouveng v. NYG Capital LLC*, 175 F. Supp.3d 280, 344 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).   In determining whether a punitive damage award is excessive, courts must consider the three "guideposts" established by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996), namely "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the

difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996) (citing *Gore*, 517 U.S. at 575, 116 S. Ct. at 1589-99). As stated in *Gore*, "perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S. Ct. 1599 (1996). The three "guideposts" are non-exhaustive, and "[i]n reviewing punitive damages awards, courts in this Circuit often compare the award to rulings on awards in other cases." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021). In determining whether a punitive damages award is excessive, a court must "keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future." *Lee*, 101 F.3d at 809 (internal quotation marks and citation omitted).

"Even when the punitive award is not beyond the outer constitutional limit marked out ... by the three *Gore* guideposts, a court must separately determine whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Bouveng*, 175 F. Supp.3d at 345 (quoting *Mathie* 121 F.3d at 816–17 (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978)). Moreover, "a federal court in a case governed by state law," such as defamation, "must apply the state law standard for appropriateness of remittitur." *Payne v. Jones*, 711 F.3d 85, 97 n.8 (2d Cir. 2013) (citing *Gasperini* 518 U.S. at 429-30, 116 S.Ct. at 2221-222 (1996)). "Accordingly, this Court must apply N.Y.C.P.L.R. § 5501(c), which … 'provides generally that damages awards are excessive or inadequate if they 'deviate[ ] materially from what would be reasonable

compensation.'"[7]  *Bouveng*, 175 F. Supp.3d at 345 (alterations in original) (quoting *Payne*, 711 F.3d at 97 n. 8).

### 2.  The Punitive Damages Award To Webber Was Not Excessive

The jury's punitive damages award to Webber is well within reason and far from excessive.  First, the evidence at trial established that Dash and Poppington acted with substantial malice in defaming Webber and that they knew their defamatory statements were false.[8]  The 2/5/2019 Post stands out in that regard.  The defamatory statements portrayed Webber as a thief who robbed a seven-year-old child by not paying her for acting in a movie, which even Dash characterized as "Disgusting" in the post.  (PX 5.) Defendants had access to the video in which the child describes what happened, yet nowhere does the child mention or allude to Webber or Muddy.  Neither Webber nor Muddy have any affiliation with the movie in which the child acted, and Defendants did not make any effort to even find out if they had any such affiliation.  Even more damning, Defendants continued their postings after Webber informed them that he was receiving death threats in response.

Dash and Poppington's conduct was neither innocent nor negligent; it was intentional and carried out with intent to harm.   The degree of Defendants'

---

[7] Plaintiffs' asserted defamation under both New York and Mississippi law.  The parties agreed that for purposes of instructing the jury, the relevant law of defamation was the same for both states.  For purposes of assessing excessiveness of punitive damages, the Court will cite to Mississippi law where, if at all, it requires a different outcome than under New York law.

[8] These and other facts distinguish the case entirely from cases relied on by Defendants, particularly *Meehan v. Snow*, 494 F. Supp. 690 (S.D.N.Y. 1980), *rev'd*, 652 F.2d 274 (2d Cir. 1981), where the Court declined to award punitive damages "based on the record which is without a scintilla of evidence that defendants knew or believed what they were saying was false."  (Pl.  Reply at 1 (Dkt. 299).)

reprehensibility, the first guidepost, is high.  *See Yurkiw*, 18 F.4th at 390 (citing *Gore*, 517 U.S. at 575-76, 116 S.Ct. 1589) ("aggravating factors that are associated with particularly reprehensible conduct … include (1) whether a defendant's conduct was marked by violence or presented a threat of violence, (2) whether a defendant's conduct evinced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice") (internal quotation marks omitted).

The second guidepost – the ratio of punitive damages to compensatory damages – also strongly supports the jury's award of punitive damages.  "While labeled a ratio, the reasonableness determination 'does not entail a simple mathematical formula, as there may be cases where a particularly egregious act has resulted in only a small amount of economic damages.'"  *Yurkiw*, 18 F.4th at 391 (quoting *DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003)).  Cases in which punitive damages are challenged as excessive typically, although certainly not always, are ones in which the amount of punitive damages awarded exceeds the amount of compensatory damages awarded.[9]  Here, however, the jury's punitive damages award of $250,000 was less than its compensatory damages award of $400,000.  Far from exceeding the amount of compensatory damages, the punitive damages awarded are only 60% of the compensatory damages awarded.  There is nothing excessive about the proportion of punitive damages to compensatory damages.  *See generally Ravina v. Columbia University*, No. 16-CV-2137, 2019 WL 1450449, at *14 (S.D.N.Y. Mar. 31, 2019) ("With respect to the ratio of punitive damages to compensatory

---

[9] "The Supreme Court has 'concluded that [a punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'"  *Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 149 (2d Cir. 2010) (discussing a 5.7 to 1 ratio) (quoting <u>State Farm Mutual Automobile Insurance Co. v. Campbell</u>, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524 (2003)).

damages, the punitive award of $500,000 is less than the jury's compensatory damages award … and thus does not raise concerns of excessiveness"); *Strader v. Ashley*, 61 A.D.3d 1244, 1247, 877 N.Y.S.2d 747, 752 (3d Dep't 2009) ("inasmuch as the awards for compensatory damages substantially exceed the awards for punitive damages, the disparity between them comports with what has been determined to be an acceptable ratio").

The third guidepost similarly underscores the reasonableness of the jury's punitive damages award to Webber.  In other comparable defamation cases, the amount of punitive damages awarded has exceeded those here in both absolute terms and in terms of the ratio to compensatory damages.  *See, e.g.*, *Bouveng*, 175 F. Supp.3d at 347-51 (where jury awarded $1,500,000 in compensatory damages, court upheld punitive damages of $1,000,000 to one defendant and $1,500,000 each to two other defendants).

 Defendants do not bother to analyze the requisite guideposts, instead arguing that compensatory damages were sufficient for purposes of both compensation and deterrence, particularly as Webber's income went up during the year he was defamed. (Dkt. 289-1 at 6.)  That argument is hardly persuasive.  Even though Webber's income increased, the evidence at trial showed that he lost several projects, one of which would have garnered an investment of six million dollars.  Absent Defendants' defamatory conduct, Webber may have made considerably more than what he made any time after the defamatory postings appeared.

Moreover, far from an isolated instance, the defamatory conduct at issue was prolonged (over a period of weeks) and widespread (having been posted on an Instagram

account with over one million followers).  In sum, there is nothing excessive, shocking, or unreasonable about the jury's award of punitive damages to Webber.

### 3. The Punitive Damages Award Against Muddy Is Excessive

As with Webber, the jury found that Defendants defamed Muddy.  Although they did not award Muddy compensatory damages, the jury awarded Muddy punitive damages in the amount of $125,000.  Defendants argue that "but for the misleading and erroneous verdict form question on punitive damages, its [sic] unclear whether it would have been awarded any punitive damages."  (Dkt. 289-1 at 7.)  As set forth above, however, Defendants waived any such argument because they did not object to the Verdict Form, and, in any event, the verdict questions were not erroneous.

Defendants also waived their right to argue that the jury could not properly award punitive damages without awarding any compensatory damages, a proposition for which there is mixed authority.  *Compare Air China Limited v. Li*, No. 07-CV-11128, 2010 WL 3260154, at *2 (S.D.N.Y. Aug. 5, 2010) (reducing punitive damages award to $0 in fraudulent inducement action because jury found that plaintiff suffered no monetary damages), and *Rivera v. City Of New York*, 40 A.D.3d 334, 344, 836 N.Y.S.2d 108, 117 (1st Dep't 2007) ("punitive damages may not be awarded absent sustainable compensatory damages"),[10] *with Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 358-59 (2d Cir. 2001) (comparing common law approaches and permitting punitive damages in absence of compensatory damages in context of Title VII discrimination claims), and

---

[10] *See also Prescott v. Leaf River Forest Products, Inc.*, 740 So.2d 301, 312 (Miss. 1999) ("This Court has held that '[p]unitive damages are not recoverable absent an award of actual damages'") (quoting *Hopewell Enterprises, Inc. v. Trustmark National Bank*, 680 So.2d 812, 820 (Miss.1996)).

*Jones v. East Brooklyn Security Services Corp.*, No. 11-CV-6333, 2014 WL 4724699, at

*3 (E.D.N.Y. Sept. 23, 2014) (stating that authority in New York is mixed and that "the

best view is that punitive damages are available" as long as liability is found and conduct

is sufficiently outrageous regardless if compensatory damages are awarded).

The jury instructions did not instruct that the jury could award punitive damages

only if they awarded compensatory damages.  Defendants did not ask for such an

instruction and did not ask that any such directive be included in the verdict form.  As a

result, Defendants waived their opportunity to raise the issue.  *Local Union No. 38 v.

Pelella*, 350 F.3d 73, 87-88 (2d Cir.2003) (holding that union waived its objection to award

of punitive damages in absence of award of compensatory damages by failing to object

to charge in which judge informed jury it could award punitive damages without awarding

compensatory damages), *cert. denied*, 541 U.S. 1086, 124 S. Ct. 2821 (2004); *Veerman

v. Deep Blue Group L.L.C.*, No. 08-CV-5042, 2010 WL 4449067, at *5 (S.D.N.Y. Nov. 3,

2010) (finding waiver because "Defendants didn't request an instruction that punitive

damages could only be awarded if compensatory damages were also awarded for the

same claim" and "[t]he verdict form, to which neither party objected, allowed the jury to

award punitive damages even if no other damages were awarded") (citing *Queenie, Ltd.

v. Nygard International*, 204 F.Supp.2d 601, 606 (S.D.N.Y. 2002)).

Despite that waiver, the question remains whether the jury's award of $125,000

was excessive given that the compensatory damages award was $0.00.  The first

guidepost suggests that the punitive damages award was not excessive.  Defendants

included Muddy along with Webber in the defamatory postings.  For the most part,

Defendants' defamation of Muddy was no less reprehensible than their defamation of

Webber.  There is, however, at least one notable distinction.  The egregious 2/5/2019 Post qualified reference to Muddy with "I suspect."  (PX 5.)  By using that phrase only with respect to Muddy, the 2/5/2019 Post suggests a lesser degree of certainty about Muddy's robbing a seven-year-old child than with regard to Webber.  In that sense, the Post may be considered less reprehensible with respect to Muddy than with regard to Webber.  The jury's verdict reflects as much, having awarded Muddy half the amount of punitive damages awarded to Webber.

The ratio of punitive damages to compensatory damages cuts against the jury's punitive damages award to Muddy.  Even if the jury had awarded only nominal damages of one dollar, the ratio of punitive damages to compensatory damages would be 125,000 to 1.  The Supreme Court has acknowledged that a high ratio is not dispositive in cases where conduct is particularly egregious and compensatory damages may be difficult to determine:  "[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.  A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."  *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602; *see also State Farm*, 538 U.S. at 426, 123 S. Ct. at 1524.  Accordingly, "[A]n award in a defamation case of nominal compensatory damages and substantial punitive damages is within the court's province under the applicable New York law."  *Fischer v. OBG Cameron Banfill LLP*, No. 08 Civ. 7707, 2010 WL 3733882, at *3 (S.D.N.Y. Sept. 24, 2010)

The parties have not provided, and the Court has not identified any, comparable cases, let alone in the context of a defamation, where a jury found no non-punitive

damages, awarded substantial punitive damages, and the defendant waived its right to challenge as a matter of law an award of punitive damages without compensatory or nominal damages.  The closest cases, for assessing excessiveness, therefore are those in which a plaintiff claiming defamation received an award of only nominal damages but also received punitive damages.  Case law suggests that punitive damages in that context are quite modest.  *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 191 (2d Cir. 2000) (upholding an award of $1 nominal damages, and remitting a $15,000 punitive damages to $10,000 where the Court found that only two of the three allegedly defamatory articles were in fact defamatory, totaling $5,000 per defamatory newspaper article published); *Fischer,* 2010 WL 3733882 (awarding $1 in nominal damages and $7,500 in punitive damages where defendant used defamatory statements in an email exchange (constituting a single instance) and directed the recipient of his emails to include defendant's defamatory statements in a letter to Immigration and Naturalization Services in an effort to have plaintiff removed from the United States).[11]

---

[11] Punitive damages awards on top of nominal damages in other, less comparable contexts (such as civil rights or a fiduciary relationship), have been substantially greater. *See, e.g.*, *Lee*, 101 F.2d at 813 (where jury awarded $1 nominal damages for malicious prosecution, court remitted $200,000 punitive damages, which is approximately $368,000 in today's dollars, to $75,000, which is approximately $138,000 in today's dollars); *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993) (where jury awarded no compensatory damages for excessive force, court remitted punitive damages award from $175,000, which is worth $350,132 in today's dollars, to $100,000, which is worth $200,075 in today's dollars, as to one defendant, and from $75,000, which is worth $150,056 in today's dollars, to $50,000, which is worth $100,038 in today's dollars,  for the second defendant); *Juniper Entertainment, Inc. v. Calderhead*, No. 07-CV-2413, 2013 WL 120636, at *7 (E.D.N.Y. Jan. 9, 2013) (awarding plaintiff $10 nominal damages and $225,000 in punitive damages despite inability to prove actual damages because of defendant's egregious breach of employment contract and fiduciary duty to employer).

Also of significance, in contrast to Webber, Muddy did not present at trial any proof of harm incurred as a result of the defamatory Instagram posts. That could well explain why the jury awarded Muddy no compensatory damages. In such circumstances, a punitive damages award of $125,000 cannot be sustained if the Court is to adhere to the Supreme Court's admonition that "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426, 123 S.Ct. at 1524.

Taking all factors into account, the Court finds that the punitive damages award of $125,000 in Muddy's favor is excessive and neither reasonable nor proportionate. Accordingly, Plaintiff Muddy may accept either remittitur of its punitive damages award to $25,000, or, alternatively, a new trial on punitive damages.

## Conclusion

For the foregoing reasons, Defendants' motion is GRANTED to the extent Plaintiff Muddy shall accept either remittitur of its punitive damages award to $25,000, or, alternatively, a new trial on punitive damages. The motion is DENIED in all other respects. To the extent not discussed above, the Court has considered the parties' remaining arguments and finds them to be without merit. Muddy shall inform the Court of its choice of remittitur or new trial within 10 days of entry of this Decision and Order.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: June 14, 2022
    New York, New York